[Cite as *Musson v. Newton Falls*, 2026-Ohio-1114.]

# IN THE COURT OF APPEALS OF OHIO
## ELEVENTH APPELLATE DISTRICT
## TRUMBULL COUNTY

| | |
|---|---|
| ANNA M. MUSSON, | CASE NO. 2025-T-0018 |
| Plaintiff-Appellee, | |
| - vs - | Civil Appeal from the Court of Common Pleas |
| CITY OF NEWTON FALLS, | |
| Defendant, | Trial Court No. 2023 CV 01093 |
| DAVID LYNCH, | |
| Defendant-Appellant. | |

## OPINION AND JUDGMENT ENTRY

Decided: March 30, 2026
Judgment: Affirmed and Remanded

*Jerome T. Linnen, Jr.,* Linnen Co., L.P.A., 789 West Market Street, Akron, OH 44303 (For Plaintiff-Appellee).

*Michael S. Loughry* and *Brian M. Zets,* Isaac Wiles Burkholder & Miller, L.L.C., Two Miranova Place, Suite 700, Columbus, OH 43215 (For Defendant-Appellant).

KATELYN DICKEY, Seventh District Judge sitting by assignment.

{¶1} Defendant-Appellant, David Lynch, appeals the April 1, 2025 judgment entry of the Trumbull County Court of Common Pleas overruling his motion for summary judgment predicated upon political subdivision employee immunity on the claim for intentional infliction of emotional distress asserted by Plaintiff-Appellee, Anna Musson. Lynch argues he is entitled to political subdivision employee immunity as he was employed as the city manager of Newton Falls, Ohio ("City") at all times relevant to the

amended complaint and acting within the scope of his employment.  Finding no reversible error, we affirm the decision of the trial court and remand this matter for trial.

## FACTS AND PROCEDURAL HISTORY

{¶2}    Musson was employed as the City's finance director from July 11, 2016 until her contract was terminated on October 11, 2021.  Although Musson's position was subject to a four-year employment contract, she was essentially an at-will employee, that is, Appellee's contract could be terminated by the City without cause upon thirty days written notice.  Upon the termination of her contract, however, Musson was contractually owed a minimum severance payment in the amount equal to the total compensation due under the remaining contract term. The City could avoid its contractual obligation under two circumstances: if the termination of Musson's contract was predicated upon her conviction for a felony, or she voluntarily left her employment with the City.  Roughly three years of Musson's contract term remained at the time the City terminated her contract.

{¶3}    Lynch's tenure as city manager began in late 2018 and ended in August of 2021. The finance director reports to the city manager.  Although Lynch was Musson's supervisor, City Council ("council") was vested with the exclusive authority to terminate Musson's contract.

{¶4}    It is important to note that Musson alleges an intentional infliction of emotional distress claim against Lynch, not a claim for wrongful termination. She concedes council could terminate her contract without cause.  Her intentional tort claim is predicated upon Lynch's imposition of leave with pay until she underwent a psychological assessment, then without pay when she did not complete the assessment. Lynch's actions were undertaken without the approval of council. Musson also relies on an exhaustive investigation of her personal and professional history that followed, allegedly undertaken by Lynch for the purpose of determining her fitness for duty, as well as the thirteen-page report in which he compiled the collected information ("confidential report"), which was provided to council then publicly disseminated.

{¶5}    Lynch's actions and the events surrounding his actions are largely undisputed. However, Lynch's state of mind behind his actions is widely in dispute.

Case No. 2025-T-0018

**{¶6}** It is undisputed that Lynch placed Musson on administrative leave with pay on May 7, 2021, and required her to undergo a psychological assessment with On Demand Drug Testing and Work Solutions ("On Demand"). According to Lynch, the imposition of administrative leave with pay was the consequence of a walkout by Musson's subordinates in the finance department and her coworkers in the utilities department, in protest of the toxic work environment created by Musson.

**{¶7}** According to Musson, the administrative leave was imposed in retaliation for her initiation of a state investigation into the City's finances. Musson testified she had been coordinating with a regional auditor and an independent auditor, both acting on behalf of the state of Ohio on 2020 audit issues including "unethical behavior, employee potential theft [sic] or huge unethical issues from staff," prior to Lynch's imposition of her administrative leave with pay. (Musson Video Depo., p. 39.) She alleged council was not conducting any oversight of Lynch's spending and she had stopped writing checks for what she perceived to be unethical behavior prior to the imposition of her leave with pay.

**{¶8}** Musson further testified the state auditors informed her that one City employee could be subject to theft charges due to his use of a government debit card at the local Circle K. According to her testimony, the use of a debit card by a government employee is prohibited by law. Musson further alleged Lynch added additional holidays that council did not approve, which constitutes a payroll increase prohibited by law. Musson testified that relatives of city employees were being given city contracts, and Lynch was subdividing contracts in order to avoid bidding requirements for projects exceeding $50,000. (*Id.*, p. 39-43.) Finally, Musson raised concern regarding the City's transfer of $420,000 from the electric fund to the general fund during COVID. Musson informed Lynch and Joseph Fritz, the City law director, that the state had sued the city of Youngstown for undertaking a similar transfer from water and sewer funds to the general fund. (Musson Depo., p. 175-176.)

**{¶9}** According to Ken Kline, who was the City mayor at all times relevant to the complaint and during his deposition in this matter, $200,000 was taken from the electric fund and placed in the general fund. He explained "the reason for that is to make our

general fund look a lot healthier than it really was so that when the city manager was spending like crazy, that the community wasn't questioning it." (Kline Depo., p. 49.)

{¶10} Musson testified that "behind the scenes [there were] a lot of arguments going on" prior to May 7, 2021, when Musson was placed on administrative leave with pay. (Musson Video Depo, p. 41.) She further testified she had been attempting to schedule appointments for several weeks with Lynch and Fritz to no avail. (Musson Depo., p. 177-178.) Although Musson testified she raised the foregoing issues to Lynch before May 6, 2021, she averred a "major blow up happened on May 6[, 2021.]" (Musson Video Depo., p. 43.)

{¶11} Lynch imposed Musson's administrative leave with pay within a few days after she informed Lynch on May 4, 2021, then Fritz on May 6, 2021, that the City was the subject of a pending investigation by the Ohio Auditor's Office, initiated as a result of Musson's reports of alleged financial improprieties committed by Lynch and other city employees. (Musson Depo., p. 110, 171-172.) Musson alleges Lynch told the public at a council meeting that she was "sick." (Musson Video Depo., p. 43.)

{¶12} It is similarly undisputed that Lynch converted Musson's paid administrative leave to unpaid leave on June 13, 2021, after she refused to undergo the psychological assessment. That same day, Kline sent an electronic mail to Lynch instructing him to stop being a "vigilante" and take the issues to council, instead of giving the City "yet another black eye." (Lynch Depo. Vol. 1 ("Lynch I"), p. 96.) On July 15, 2021, the Ohio Department of Job and Family Services found no cause for the imposition of Musson's administrative leave without pay status and awarded unemployment compensation to Musson. (*Id.* at p. 94.)

{¶13} According to Lynch, his decision to place Musson on unpaid leave was based on her refusal to complete the required psychological assessment. Lynch testified the psychological assessment was based on his fear that a physical altercation may occur in the workplace. (*Id.* at p. 80.)

{¶14} However, Lynch conceded he did not believe the situation with Musson constituted an emergency. (*Id.*) Later in his deposition, Lynch similarly conceded he had no safety concerns for Musson's coworkers. (*Id.* at p. 149-150.) Finally, Lynch admitted he never witnessed any abusive conduct by Musson. (*Id.* at p. 51.)

{¶15} Moreover, the record reflects complaints by Musson's subordinates and coworkers regarding her behavior in the workplace had been tendered to the city manager for years prior to Lynch's arrival. Despite the complaints, including allegations that subordinates and coworkers left their employment with the City due solely to Musson's conduct, Musson was never disciplined prior to her announcement that the City was the subject of an investigation by state auditors. In February of 2021, Lynch directed Musson to work from home and participate in a management evaluation at PRADCO. The PRADCO evaluation is not in the record and Musson returned to work later that month without any discipline.

{¶16} Further, the City extended Musson's employment as the City finance director when it offered her the four-year employment contract at issue in this appeal on November 23, 2020. (Kline Depo., p. 35.) The contract was predicated upon the representation that "the finance director has practiced in the State of Ohio for a period in excess of 20 years establishing a remarkable record of proficiency and efficiency in government for the City of Newton Falls, Ohio." (*Id*. at p. 36.) Kline testified he was not present on a daily basis to assess Musson's work, however, "[he] [w]ould only hear from the city manager that previously before that that [sic] [Musson] was wonderful or receiving awards, and then, boom, [the confidential report.]" (*Id.* at p. 35.)

{¶17} On June 15, 2021, Lynch distributed the confidential report to Kline and members of council. As fodder for the confidential report, Lynch contacted each of Musson's previous employers dating back to her first job after she graduated from college. The references to Musson's previous employment and current employment with the City in the confidential report, which Lynch concedes is comprised largely of hearsay statements, include allegations of criminal conduct by Musson and observations regarding Musson's mental health from former subordinates.

{¶18} Lynch also contacted Musson's former husband, Chad Musson, to gather information to assemble the confidential report. Lynch requested copies of audio recordings surreptitiously obtained by Chad during the couple's divorce proceedings ten years prior. Lynch first testified he was contacted by Chad during the course of the investigation, and Chad told Lynch that Musson had "very serious anger problems." (*Id.* at p. 112.) However, during Lynch's second deposition, he was asked whether Musson

was on "some form of administrative leave when [*he] called [Chad*]," and Lynch responded, "[y]es." (Emphasis added) (Lynch Depo. Vol. 2 ("Lynch II"), p. 23.) Lynch further testified *he first contacted Chad* in June of 2021. (Emphasis added) (*Id.* at p. 44.)

{¶19} Lynch initially claimed he could not recall whether he asked Chad to send copies of audio recordings of the Mussons. However, Lynch later conceded "either way [he] was interested in hearing them," and he "believe[d]" he requested the audio recordings. (Lynch I, p. 112-113.)

{¶20} Musson testified the audio recordings were played for her subordinates. Lynch conceded at his deposition that he played the audio recordings for at least one of Musson's subordinates. (*Id.* at p. 145.)

{¶21} In addition to the remarkable depths plumbed by Lynch in his investigation of Musson's ability to perform her job, despite her at-will status, the confidential report was by no means an objective presentation of the evidence. The confidential report, which begins with Musson's first job after college and extends to her job with the City, contains the following accusations and observations attributed to previous or current subordinates where noted, as well as bombastic characterizations and conclusions by Lynch:

- Musson left her first employer after only nine months on the job, with "the wreckage of destroyed employee morale in her wake," (Lynch's characterization) having caused one subordinate to quit and another to be granted 30-days leave without pay in order to recover from "nerves;"

- Musson's second public employer was the next "object of [Musson's] psychological warfare," (Lynch's characterization) she assaulted one subordinate, who was attempting to unionize the finance department because of Musson, by pushing the subordinate down a flight of steps, and another subordinate, by dragging him around the office by his necktie. Lynch quotes the second subordinate as describing Musson as " 'smart at finances but likely insane;' "

Case No. 2025-T-0018

- Lynch quotes another former subordinate as describing Musson as " 'the nastiest person [she] had ever met,' " and a " 'pathological liar;' "

- Lynch observes Musson "was capable of moments of kindness and reason that were regularly interrupted by events of [ ] explosive anger." Lynch observed "[o]ne would never know if one's next encounter with [Musson] would reveal [her] in a virtually catatonic Charles Manson-like State of insane rage;"

- Lynch asserts Musson can be heard in the audio records threatening she would " 'put a bullet in [Chad's] fucking head.' " Lynch claimed the audio recordings were collected as a consequence of "additional research" he performed to get at the "root of [Musson's] potentially dangerous psychiatric problems" (Lynch's characterization);

- According to Lynch, an unnamed City employee informed him that Musson was overheard asking for "serious advice from outside parties as to how she might manage the murder of her ex-husband;"

- Lynch opined he "strongly suspect[ed] [Musson] suffers from severe psychiatric potentially homicidal tendencies," as she "bragged to [Lynch] that she is a well-trained marksman and that she expects people to take her seriously because she carries a loaded weapon on a regular basis."

{¶22} Although Lynch denied publicly disseminating the confidential report, Kline confirmed it "[got] into the public domain," that is, "general members of the public had access to it." (Kline Depo., p. 19.) More specifically, Kline testified, "[y]eah, and I can't tell you who they got it from. I don't know. But somebody somewhere sent, forwarded or whatever this, too, because I remember that taking place." (*Id.*) Kline testified the public dissemination of the confidential report occurred within a week of his receipt of the document from Lynch on June 15, 2021. (*Id.* at p. 21.)

{¶23} As the foregoing events unfolded, council attempted to terminate Lynch's contract, however council's action was determined to be illegal based on the composition

Case No. 2025-T-0018

of council during the vote. (*Id.* at p. 26.) Lynch ultimately resigned in July of 2021, pursuant to a separation agreement, in exchange for $136,848, comprised of $113,000 in severance and $23,848 in earned sick and vacation time. (Lynch I, p. 32-33.)

{¶24} On October 11, 2021, council terminated Musson's contract. There is no evidence that Musson was provided 30-days' notice as required by the contract. Likewise, there is no dispute that Musson had not been convicted of a felony, which would have excused any severance payment by the City.

{¶25} On March 21, 2022, Musson filed an action against Lynch and the City asserting contract and tort claims arising out of her employment with the City. Musson voluntarily dismissed her claims against Lynch on December 5, 2022 without prejudice. After obtaining additional evidence, Musson requested leave of court to file an amended complaint renaming Lynch as a defendant, however, the motion for leave was overruled. As a consequence, Musson voluntarily dismissed the remaining claims against the City on July 20, 2023.

{¶26} On July 24, 2023, Musson filed the underlying action against the City asserting claims for declaratory judgment (Count I), breach of contract (Count II), intentional infliction of emotional distress (Count III), negligent hiring, supervision, training, and retention (Count IV), promissory estoppel (Count V), and defamation (Count VI). The complaint named Lynch as a defendant in the counts for intentional infliction of emotional distress and defamation.

{¶27} The City raised the affirmative defense of political subdivision immunity in its answer on August 22, 2023. Lynch filed his answer on August 23, 2023, then his first amended answer with leave of court on January 25, 2024, but did not raise the affirmative defense of political subdivision immunity in either pleading.

{¶28} Musson filed a motion for partial summary judgment on January 24, 2025. She requested summary judgment on Counts I and II; her right to prejudgment interest; and a finding the affirmative defense of political subdivision immunity did not foreclose her tort claims in Counts III, IV, and VI.

{¶29} The City filed a motion for summary judgment on January 27, 2025. In pertinent part, the City argued it was entitled to summary judgment on the tort claims based on political subdivision immunity. In order for a political subdivision to be liable for

Case No. 2025-T-0018

the acts of one of its employees, the City argued the employee must have been acting within the scope of his employment. But when the tort is intentional (as alleged in the claim for intentional infliction of emotional distress), the employee's acts necessarily fall outside of the scope of employment.

{¶30} That same day, Lynch filed a motion for summary judgment asserting he was an employee of the City at all times and, therefore, was entitled to political subdivision immunity, despite the fact that he had not asserted the affirmative defense in either of his answers. As a consequence, Musson argued in her opposition brief that Lynch had waived the affirmative defense.

{¶31} With respect to the exceptions to employee sovereign immunity, Musson argued:

[Lynch] is not entitled to immunity under 2744.03(A)(6) which provides an employee may be held personally liable if his acts or omissions were manifestly outside the scope of his employment or official responsibilities; his acts or omissions were with malicious purpose, in bad faith, or in a wanton and reckless manner. It should be noted that [the City] in its answer denied Lynch was acting within the course and scope of his employment and this alone would be a question of fact for the jury. However, the intent of Lynch and, whether he acted with malice as discussed in the previous section [addressing Lynch's claim based on the elements of intentional infliction of emotional distress] is clearly a question of fact for the jury. Summary judgment is not warranted on this issue.

(2/24/25 Br. In Opp., p. 21.)

{¶32} On March 14, 2025, at a non-evidentiary hearing on the pending motions, Musson argued Lynch had waived the sovereign immunity defense because he failed to assert it in his amended answer. That same day, Lynch filed a motion to file a second amended answer instanter to include the affirmative defense of employee sovereign immunity. No opposition brief was filed. Fourteen days later, on March 28, 2025, the trial court sustained Lynch's unopposed motion to amend his answer for the second time.

Case No. 2025-T-0018

**{¶33}** The March 28, 2025 judgment entry reads in relevant part, "[t]he Clerk of Court is hereby instructed to file Exhibit A of Defendant Lynch's Motion as his Second Amended Answer Instanter." However, the second amended answer was not re-docketed as an independent pleading by the clerk of courts.

**{¶34}** On April 1, 2025, the trial court issued the judgment on the cross-motions for summary judgment currently before us. The trial court entered summary judgment in favor of Musson on her declaratory judgment claim (Count I), declaring a City ordinance to be unconstitutional, and her breach of contract claim (Count II). The trial court entered summary judgment in favor of the City and Lynch on the defamation claim (Count VI), finding the claim was barred by the applicable statute of limitations.

**{¶35}** The trial court overruled the cross-motions for summary judgment on the remaining claims – Count III (intentional infliction of emotional distress), Count IV (negligent hiring, supervision, training, and retention), and Count V (promissory estoppel). The trial court found genuine issues of material fact existed as to the remaining claims, which would proceed to a jury trial. The only claim pending against Lynch was the intentional infliction of emotional distress claim. The trial court did not make any specific findings as to Lynch's employee sovereign immunity defense.

**{¶36}** Lynch filed a timely notice of appeal on April 4, 2025. The City also filed a timely notice of appeal. The City's appeal is proceeding simultaneously with this appeal in Case No. 25-T-0019.

## ANALYSIS

## ASSIGNMENT OF ERROR

**THE TRIAL COURT ERRED TO THE PREJUDICE OF APPELLANT DAVID LYNCH WHEN THE COURT DENIED LYNCH'S MOTION FOR SUMMARY JUDGMENT ASSERTING IMMUNITY UNDER OHIO'S POLITICAL SUBDIVISION TORT LIABILITY ACT (OHIO REVISED CODE CHAPTER 2744).**

**{¶37}** "Generally, the denial of summary judgment is not a final, appealable order." *Ruckman v. Smith*, 2022-Ohio-1813, ¶ 9 (11th Dist.), citing *Hubbell v. Xenia*, 2007-Ohio-

4839, ¶ 9.  "However, the Supreme Court of Ohio has held that '[w]hen a trial court denies a motion in which a political subdivision or its employee seeks immunity under R.C. Chapter 2744, that order denies the benefit of an alleged immunity and is therefore a final, appealable order pursuant to R.C. 2744.02(C).' " *Ruckman* at ¶ 9, quoting *Hubbell* at syllabus.

**{¶38}** Lynch dedicates a considerable portion of his appellate brief to the argument that Musson cannot prove the elements of her intentional infliction of distress claim.  However, "[a]ppellate review under R.C. 2744.02(C) is limited to the review of alleged errors that involve the denial of the benefit of an alleged immunity from liability." *Ruckman* at ¶ 9.  In other words, we are prohibited by statute from considering the merits of Musson's intentional tort claim and whether the evidence in the record warrants summary judgment.

**{¶39}**  Decisions denying summary judgment on the issue of immunity are reviewed de novo, "i.e., independently and without deference to the trial court's decision." *Kubala v. Smith*, 2023-Ohio-991, ¶ 9 (11th Dist.).

> Civ.R. 56(C) specifically provides that before summary judgment may be granted, it must be determined that: (1) No genuine issue as to any material fact remains to be litigated; (2) the moving party is entitled to judgment as a matter of law; and (3) it appears from the evidence that reasonable minds can come to but one conclusion, and viewing such evidence most strongly in favor of the party against whom the motion for summary judgment is made, that conclusion is adverse to that party.

*Temple v. Wean United, Inc.*, 50 Ohio St.2d 317, 327 (1977); *Allen v. 5125 Peno, LLC*, 2017-Ohio-8941, ¶ 6 (11th Dist.), citing *Holliman v. Allstate Ins. Co.*, 86 Ohio St.3d 414, 415 (1999).

**{¶40}** "The initial burden is on the moving party to set forth specific facts demonstrating that no issue of material fact exists, and the moving party is entitled to judgment as a matter of law." *Allen* at ¶ 6, citing *Dresher v. Burt*, 75 Ohio St.3d 280, 292-293 (1996). "If the movant meets this burden, the burden shifts to the nonmoving party to

establish that a genuine issue of material fact exists for trial." *Allen* at ¶ 6, citing *Dresher* at 293.

{¶41} "[T]he purpose of summary judgment is 'not to try issues of fact, but rather to determine whether triable issues of fact exist.' " *Smathers v. Glass*, 2022-Ohio-4595, ¶ 3, quoting *Viock v. Stowe-Woodward Co.*, 13 Ohio App.3d 7, 15 (6th Dist. 1983). Therefore, a court making an immunity determination at the summary judgment stage of proceedings "must look at the evidence and determine whether it is so one-sided that the party claiming immunity should prevail as a matter of law." *Smathers* at ¶ 3, citing *Turner v. Turner*, 67 Ohio St.3d 337, 340 (1993).

{¶42} Before reaching Lynch's employee sovereign immunity argument, we must first address Musson's argument that Lynch waived sovereign immunity due to his failure to raise it in his answer and his first amended answer, and that his second amended answer, which specifically raised the affirmative defense of political subdivision immunity, was never docketed. Musson did not file an appeal of the trial court's implied conclusion that the affirmative defense had not been waived by Lynch. Accordingly, Lynch's alleged waiver of the sovereign immunity defense is not properly before us in this appeal.

{¶43} R.C. Chapter 2744 creates a presumption of immunity for political subdivision employees. *Ruckman*, 2022-Ohio-1813, at ¶ 15 (11th Dist.). R.C. 2744.03(A) sets out defenses or immunities that a political subdivision employee may assert to establish nonliability in a civil action for damages allegedly caused by an act or omission in connection with a governmental or proprietary function. *Argabrite v. Neer*, 2016-Ohio-8374, ¶ 7.

{¶44} An "employee" for purposes of this section "means an officer, agent, employee, or servant, whether or not compensated or full-time or part-time, who is authorized to act and is acting within the scope of the officer's, agent's, employee's, or servant's employment for a political subdivision." It also "includes any elected or appointed official of a political subdivision." R.C. 2744.01(B).

{¶45} Pursuant to R.C. 2744.03(A):

> (A) In a civil action brought against a political subdivision or an
> employee of a political subdivision to recover damages for injury, death, or
> loss to person or property allegedly caused by any act or omission in

connection with a governmental or proprietary function, the following defenses or immunities may be asserted to establish nonliability:

. . .

(6) In addition to any immunity or defense referred to in division (A)(7) of this section and in circumstances not covered by that division or sections 3314.07 and 3746.24 of the Revised Code:

(a) The employee's acts or omissions were manifestly outside the scope of the employee's employment or official responsibilities;

(b) The employee's acts or omissions were with malicious purpose, in bad faith, or in a wanton or reckless manner;

(c) Civil liability is expressly imposed upon the employee by a section of the Revised Code. Civil liability shall not be construed to exist under another section of the Revised Code merely because that section imposes a responsibility or mandatory duty upon an employee, because that section provides for a criminal penalty, because of a general authorization in that section that an employee may sue and be sued, or because the section uses the term "shall" in a provision pertaining to an employee.

**{¶46}** The parties to this appeal agree the exception in R.C. 2744.03(A)(6)(c) is inapplicable here, as civil liability is not imposed by statute. Musson asserts the remaining two exceptions apply, however Lynch argues Musson is estopped from asserting he acted outside the scope of his employment because she alleged he was acting within the scope of his employment in her complaint. Musson counters the City alleged Lynch was acting outside the scope of his employment in its answer.

**{¶47}** "R.C. Chapter 2744 does not define what conduct is manifestly outside the scope of the employee's employment or official responsibilities." (internal quotations omitted) *Kubala,* 2023-Ohio-991, at ¶ 11 (11th Dist.). We have observed:

"[O]hio courts have generally held that ' " 'conduct is within the scope of employment if it is initiated, in part, to further or promote the master's business.' " ' " *Thomas* [*v. Bauschlinger*, 2025-Ohio-281,] ¶ 25 [(9th Dist.)], quoting *Curry v. Blanchester*, 12th Dist. Clinton Nos. CA2009-08-010, CA2009-08-012, 2010-Ohio-3368, 2010 WL 2807948, ¶ 30, quoting *Jackson v. McDonald*, 144 Ohio App.3d 301, 307, 760 N.E.2d 24 (5th Dist.2001). " 'For an act to fall within the scope of employment, it must be "calculated to facilitate or promote the business for which the [employee or agent] was employed." ' " *Thomas* at ¶ 25, quoting *Johnson v. Godsey*, 2d Dist. Clark No. 2012 CA 80, 2013-Ohio-3277, 2013 WL 3936206, ¶ 32, quoting *Osborne v. Lyles*, 63 Ohio St.3d 326, 329, 587 N.E.2d 825 (1992). " 'In general, if an act is committed within the scope of employment, it will be authorized, either expressly or impliedly, by the employer.' " *Thomas* at ¶ 25, quoting *Johnson* at ¶ 32. " ' "It is only where the acts of [public] employees are motivated by actual malice or other [situations] giving rise to punitive damages that their conduct may be outside the scope of their . . . employment." ' " *Thomas* at ¶ 25, quoting *Curry* at ¶ 30, quoting *Jackson* at 307, 760 N.E.2d 24. " 'The act must be so divergent that it severs the employer-employee relationship.' " *Thomas* at ¶ 25, quoting *Wee Care Child Ctr., Inc. v. Ohio Dept. of Job & Family Servs.*, 10th Dist. Franklin No. 13AP-1004, 2014-Ohio-2913, 2014 WL 2973285, ¶ 28.

In the similar context of immunity for state employees, R.C. 9.86 provides exemptions from immunity akin to those contained in R.C. 2744.03(A)(6)(a) and (b), which are applicable to political-subdivision employees. See R.C. 9.86 (". . . no officer or employee shall be liable in any civil action that arises under the law of this state for damage or injury caused in the performance of his duties, unless the officer's or 'actions were *manifestly outside the scope of his employment or official responsibilities, or unless the officer or employee acted with malicious purpose, in bad faith, or in a wanton or reckless manner*." (Emphasis added.)). With respect to R.C. 9.86, in addressing whether an employee acted manifestly outside the

scope of his employment, the Tenth District has indicated that " 'an employer is not liable for independent self-serving acts of his employees which in no way facilitate or promote his business.' " *Oye v. Ohio State Univ.*, 10th Dist. Franklin No. 02AP-1362, 2003-Ohio-5944, 2003 WL 22511511, ¶ 7, quoting *Byrd v. Faber*, 57 Ohio St.3d 56, 59, 565 N.E.2d 584 (1991). "Implicit in this statement is that such self-serving acts are not within an employee's scope of employment." *Oye* at ¶ 7. "Given this framework of analysis, [the Tenth District] [has] interpret[ed] actions 'manifestly outside the scope of his employment or official responsibilities,' as used in R.C. 9.86, to include actions that bear no relationship to the conduct of the state's business." *Oye* at ¶ 7, citing *Hidey v. Ohio State Hwy. Patrol*, 10th Dist. Franklin No. 97API12-1587, 1998 WL 655277, *1 (Sept. 22, 1998). We likewise conclude that a political-subdivision employee acts "manifestly outside the scope of his employment or official responsibilities" when his actions bear no relationship to the conduct of the political subdivision's business for purposes of the first exemption to immunity contained in R.C. 2744.03(A)(6)(a).

*Kubala* at ¶ 11-12.

**{¶48}**  "The doctrine of equitable estoppel precludes a party from asserting certain facts where the party, by its conduct, has induced another to change its position in good faith reliance upon the party's conduct." *Van De Hey v. Ashtabula Cnty. Aud.*, 2023-Ohio-346, ¶ 41 (11th Dist.), citing *Ultimate Salon & Spa, Inc. v. Legends Constr. Group*, 2019-Ohio-2506, ¶ 32 (11th Dist.).  Musson argued both exceptions to employee sovereign immunity applied to Lynch's conduct in her brief in opposition to Lynch's motion for summary judgment.

**{¶49}**  There is no evidence in the record that Lynch was induced to change his position or was otherwise prejudiced based on Musson's allegation in her complaint. Moreover, Musson requests punitive damages in her complaint, which require evidence of actual malice. *Kubala* at ¶ 11.  Finally, " '[w]hether an employee acted within the scope of employment generally is a question of fact to be decided by the jury.' " *Id*. at ¶ 25,

Case No. 2025-T-0018

quoting *Townsend v. Kettering*, 2022- Ohio-2710, ¶ 23 (2d. Dist.). Accordingly, we find Musson is not estopped from asserting the exception to employee subdivision immunity if R.C. 2744.03(A)(6)(a) applies.

{¶50} We summarized the law applicable to R.C. 2744.03(A)(6)(b) in *Priddy v. Kline*, 2025-Ohio-5718 (11th Dist.) as follows:

> Under R.C. 2744.03(A)(6), employees of political subdivisions are immune from liability unless the employee's acts were manifestly outside the scope of the employment; the employee's acts or omissions were made with malicious purpose, in bad faith, or in a wanton or reckless manner; or civil liability is expressly imposed upon the employee by a section of the Revised Code. Pursuant to this section, "government employees are immune from tort liability for actions that fall within the scope of their employment and official responsibilities," however their "immunity is not absolute."(Emphasis added.) *Hill v. Schildmeyer*, 2024-Ohio-3261 at ¶ 35, 252 N.E.3d 561, citing *Maternal Grandmother, ADMR v. Hamilton Cty. Dept. of Job & Family Servs.*, 2021-Ohio-4096, ¶ 7, 167 Ohio St.3d 390, 193 N.E.3d 536. "Government employees acting within the scope of their employment are not entitled to immunity if 'the employees' acts or omissions in the course and scope of their employment were wanton[,] reckless,' malicious, or done in bad faith." *Hill* at ¶ 35, quoting *Maternal Grandmother* at ¶ 7, citing R.C. 2744.03(A)(6)(b).

> The Supreme Court of Ohio has held that "reckless" and "wanton" describe different and distinct degrees of care that are not interchangeable. *Anderson v. Massillon*, 2012-Ohio-5711, ¶ 31, 134 Ohio St.3d 380, 983 N.E.2d 266. "Reckless conduct is characterized by the conscious disregard of or indifference to a known or obvious risk of harm to another that is unreasonable under the circumstances and is substantially greater than negligent conduct." (Citations omitted). *Id.* at ¶ 34.

Case No. 2025-T-0018

"Wanton misconduct is the failure to exercise any care toward those to whom a duty of care is owed in circumstances in which there is great probability that harm will result." (Citation omitted.) *Id.* at ¶ 33. "[O]ne acting in a wanton manner is aware of the risk of the conduct but is not trying to avoid it and is indifferent to whether harm results." (Citation omitted.) *Id.*

"Malice" is characterized by "hatred, ill will or a spirit of revenge," or "a conscious disregard for the rights and safety of other persons that has a great probability of causing substantial harm." *Preston v. Murty*, 32 Ohio St.3d 334, 336, 512 N.E.2d 1174 (1987). It also refers to "the willful and intentional design to do injury, or the intention or desire to harm another, usually seriously, through conduct which is unlawful or unjustified." (Citation omitted.) *Jackson v. Butler Cty. Bd. of Cty. Commrs.*, 76 Ohio App.3d 448, 454, 602 N.E.2d 363 (12th Dist.1991).

"Bad faith" connotes a " 'dishonest purpose' " or " 'conscious wrongdoing. . . .' " *Canfora v. Coiro*, 2007-Ohio-2314, ¶ 72, 2007 WL 1395590 (11th Dist.), quoting *Cook v. Cincinnati*, 103 Ohio App.3d 80, 90, 658 N.E.2d 814 (1st Dist. 1995). It also embraces more than bad judgment and involves a lack of reasonable justification. *See Zoppo v. Homestead Ins. Co.*, 71 Ohio St.3d 552, 554, 644 N.E.2d 397 (1994)

The demonstration of recklessness is subject to a high standard when attempting to abolish employee immunity under R.C. 2744.03(A)(6)(b). *Rankin v. Cuyahoga Cty. Dept. of Children & Family Servs.*, 2008-Ohio-2567, ¶ 37, 118 Ohio St.3d 392, 889 N.E.2d 521.

*Id.* at ¶ 35-40.

{¶51} In *Parmertor v. Chardon Local Schools*, 2019-Ohio-328, ¶ 42 (11th Dist.), we observed:

"While a political subdivision employee's entitlement to immunity is ordinarily a question of law, whether there exists malice, bad faith, and

wanton or reckless behavior are generally questions of fact to be resolved by the jury. 'Summary judgment is appropriate only when the facts are clear and fail to rise to the level of conduct that could be construed as malicious, in bad faith, or wanton and reckless.' " *Spitulski v. Bd. of Educ. of Toledo City School Dist.*, 6th Dist. Lucas No. L-16-1225, 2017-Ohio-2692, 90 N.E.3d 287, ¶ 23, quoting *Long v. Hanging Rock*, 4th Dist. Lawrence No. 09CA30, 2011-Ohio-5137, 2011 WL 4584930, ¶ 18. *See also O'Toole* [*v. Denihan*, 2008-Ohio-2574] at ¶ 75, and *Vidovic* [*v. Hoynes,* 2015-Ohio-712 (11th Dist.)] at ¶ 53.

*Id.* at ¶ 42.

**{¶52}** The requisite state of mind needed to overcome the presumption for governmental immunity can be established by facts that meet a standard for a lesser degree of care than the standard for the intent element of an intentional tort. The presumption for immunity is overcome by evidence that the employee's state of mind was one of three "different and distinct degrees of care [that] are not interchangeable." *Anderson v. Massillon*, 2012-Ohio-5711, ¶ 31. Both malicious and willful misconduct require proof of an intentional or deliberate purpose to act in a manner that is likely to cause injury, whereas wanton or reckless behavior can be proven by a conscious disregard of, or indifference to, the risk of harm. *Id.* at ¶ 32-33.

**{¶53}** Lynch argues the trial court improperly applied the exceptions to immunity for political subdivision employees found in R.C. 2744.03(A)(6)(a) and (b), because his conduct "did not rise above the level of negligent conduct." (Rep. Br., p. 6.) Applying the heightened standard to a political subdivision employee's state of mind, we find nonetheless there are genuine issues of material fact as to whether Lynch acted with malicious purpose, in bad faith, or in a wanton or reckless manner.

**{¶54}** Musson stated that sometime before May 6, 2021, she reported suspected City fraud to a regional state auditor. (Musson Video Depo., p. 38.) Her allegations included unethical spending, potential employee theft, no oversight of Lynch's spending, and nepotism on contracts. (*Id.* at 38-42.) On May 6, 2021, Musson advised Fritz of an impending state investigation. (*Id.* at p. 42; 3/9/23 Musson Aff. ¶ 6.) The next day, Lynch

Case No. 2025-T-0018

placed Musson on paid administrative leave and told council and the public that she was sick. (Musson Video Depo., p. 43; 3/9/23 Musson Aff. ¶ 7.) Lynch instructed Musson that she was to obtain a psychological assessment from On Demand relating to her mental health. (Musson Depo., p. 127-130.) On June 13, 2021, Lynch placed her on unpaid leave. (Musson Video Depo., p. 44; 3/9/23 Musson Aff. ¶ 10.)

{¶55} Musson further stated that Lynch obtained tape recordings of marital conversations between her and her ex-husband, which were published on Facebook. (Musson Video Depo., p. 45-46; Musson Depo., p. 242.) She stated that Lynch also authored a "report" or "dossier" about her [the confidential report], which he distributed to Kline and members of council. The confidential report, however, did not remain confidential and was passed around at a council meeting and was published on Facebook. (Musson Depo., p. 268-269.) The confidential report details Musson's employment with her past employers dating back to 2001 though her employment with the City. (Musson Depo., Ex. 15.) It consists almost entirely of hearsay. The confidential report includes allegations by Lynch that: (1) Musson left a former workplace "with the wreckage of destroyed employee morale in her wake"; (2) Musson's next employer was "the object of [Musson's] psychological warfare"; (3) Musson was described by a former employee as being "in deep need of psychiatric treatment"; (4) Musson suffered from a "catatonic Charles Manson-like [s]tate of insane rage"; (5) Musson asked for advice "as to how she might manage the murder of her ex-husband"; and (6) Lynch listened to an audio recording between Musson and her ex-husband where she threatened to "put a bullet in [his] fucking head". (*Id.*)

{¶56} Lynch, on the other hand, stated he instructed Musson to undergo a psychological assessment at On Demand because he was "trying to find a way to get a handle on what was going on in that department and what could be done because of complaints of the employees that [Musson] was abusive as a manager of those employees." (Lynch I, p. 51.) He conceded he never observed Musson act inappropriately. (*Id.*) Lynch considered the assessment to be a "fitness for duty" exam. (*Id.* at p. 68.) He was concerned that Musson was not mentally able to perform her duties. (*Id.* at p. 68-69.) At this point, Lynch considered Musson to be on medical leave pending her assessment. (*Id.* at p. 69.) Lynch admitted he requested the assessment and placed

Case No. 2025-T-0018

Musson on administrative leave after Musson informed the City about an investigation regarding improper city expenditures by the Ohio Auditor's Office. (*Id*. at p. 77-80.)

**{¶57}** As to the confidential report, Lynch admitted that it contained a "high percentage" of hearsay. (*Id*. at p. 107.) Lynch's stated purpose for compiling the confidential report and distributing it to Kline and members of council was for council to "be informed." (*Id*.) He conceded to comparing Musson to Charles Manson in the report. (Lynch II, p. 36.) Lynch testified Chad informed Lynch that Musson had serious anger problems and he had audio tapes to prove it. (Lynch I., p. 111-112.) Lynch admitted he initiated contact with Chad. Lynch further conceded he asked Chad to provide him with copies of the tapes. (*Id*. at p. 113.) Lynch stated the tapes were of conversations between Musson and her ex-husband dating back ten years. (*Id*.) These tapes involved intimate details about Musson's marriage. (*Id*., p. 122-123.) Lynch provided a copy of these tapes to the City. (*Id*., p. 123.) During all of this time, Lynch was employed as the city manager. (*Id*., p. 121.)

**{¶58}** In summary, Musson and Lynch gave very different accounts of Lynch's state of mind when he imposed Musson's administrative leave, both paid and unpaid, and when he collected, compiled, and distributed the information in the confidential report. If Musson's account is to be believed, Lynch set out on a vendetta against her because she instigated a state auditor investigation into the City's finances. If Lynch's account is to be believed, Musson was a difficult employee, possibly suffering from a mental health issue, which he was attempting to address.

**{¶59}** Last year, we applied the heightened standard applicable to allegations that a political subdivision employee acted with malice, bad faith, and in a wanton or reckless manner in *Priddy v. Kline*, 2025-Ohio-5718 (11th Dist.). Priddy, who was the acting City manager, attempted to address a funding issue relating to the City police department, which unintentionally resulted in the absence of a school resource officer ("SRO") at the local school. When the absence of the SRO was discovered, Kline, who was the City mayor, faced an onslaught of angry citizens with at least one citizen calling for his resignation. As a consequence, he sent an electronic mail to Priddy and the members of council requesting Priddy's resignation and accusing her of attempting to falsify

documents and distributing those falsified documents at a public-school meeting. *Id*. at ¶ 21, 42.

**{¶60}** Priddy filed a civil action against Kline for invasion of privacy - false light and defamation. We found Kline's conduct was not undertaken with malice, bad faith, or in a wanton or reckless manner.  Although we agreed Kline's electronic mail was "framed in a hasty and incautious fashion," we excused the unsupported accusations he leveled against Priddy due to the urgency of the "highly controversial" and "politically vexing" issue.  The challenged electronic mail in *Priddy* occurred within a few days of the public outrage regarding the absence of SRO.

**{¶61}** Here, Lynch accused Musson of being the subject of years of complaints regarding her conduct, with no discipline, then placed her on administrative leave within days of her revelation that he and the City were the subject of a state auditor's investigation due to her disclosures. Lynch initially predicated Musson's administrative leave on his concerns regarding a physical altercation then conceded he did not consider the Musson issue to be an emergency. According to his own testimony, complaints about Musson's behavior had persisted for years without disciplinary action.  In the midst of the alleged tumult caused by Musson in the workplace, she was offered a four-year contract in November of 2020.

**{¶62}** Further, Lynch's challenged conduct, that is, the imposition of leave with pay, then without pay, and the pervasive investigation and the resulting confidential report, occurred over the course of a month, not a few days like the electronic mail in *Priddy*.  Simply stated, Lynch had the benefit of time to consider the propriety of his actions.  Even assuming a reasonable factfinder could conclude Lynch's collection of the personal information gathered during his investigation and its inclusion in the confidential report, the dissemination of the confidential report and the dissemination of the audio recordings to Musson's subordinates and coworkers by Lynch were undertaken in good faith, the same reasonable factfinder could also conclude Lynch's collection of the personal information gathered during his investigation and its inclusion in the confidential report, the dissemination of the confidential report and the dissemination of the audio recordings to Musson's subordinates and coworkers by Lynch is evidence of Lynch's bad faith, malicious purpose, or wanton and reckless manner.

Case No. 2025-T-0018

**{¶63}** The Ohio Supreme Court has held a court making an immunity determination at the summary judgment stage of proceedings "must look at the evidence and determine whether it is so one-sided that the party claiming immunity should prevail as a matter of law." *Smathers,* 2022-Ohio-4595, at ¶ 3. Based on the evidence in the record, we find reasonable minds could disagree as to whether Lynch acted with malicious purpose, in bad faith, or in a wanton or reckless manner. Accordingly, we find Lynch's sole assignment of error is meritless.

## CONCLUSION

**{¶64}** For the foregoing reasons, the April 1, 2025 judgment entry overruling Lynch's motion for summary judgment predicated upon political subdivision employee immunity is affirmed and this matter is remanded for trial.

CAROL ANN ROBB, J., concurs.

MARK A. HANNI, J., dissents with a Dissenting Opinion.

Case No. 2025-T-0018

Hanni, J., dissenting.

{¶65} With regard and respect to my colleagues, I must dissent from the majority opinion. I would conclude that no genuine issues of material fact exist and Lynch is entitled to summary judgment on the issue of immunity.

{¶66} An employee of a political subdivision has a presumption of immunity. *Cook v. Cincinnati*, 103 Ohio App.3d 80, 90 (1st Dist. 1995). The employee will only be stripped of that immunity if one of the statutory exceptions apply.

{¶67} I will address the three possible exceptions out of order.

{¶68} As to the third possible exception to immunity, there is no statute identified that expressly imposes liability upon Lynch. And there is no allegation here that R.C. 2744.03(A)(6)(c) applies in this case. Therefore, I would find the exception to immunity in R.C. 2744.03(A)(6)(c) does not apply here.

{¶69} As to the first possible exception to immunity, I would find the exception to immunity in R.C. 2744.03(A)(6)(a), which requires that the employee's acts or omissions were manifestly outside the scope of the employee's employment, cannot apply here.

{¶70} Musson's claim for intentional infliction of emotional distress against Lynch and the City states: "At all times pertinent to this action, Defendant Lynch was acting within the course and scope of his employment with Defendant Newton Falls and as the City Manager, was the direct supervisor of Plaintiff Musson." (Complaint, ¶ 26). And Lynch admitted this in his answer. (Answer, ¶ 2). It would be disingenuous for Musson to now attempt to argue that Lynch was acting outside of the scope of his employment when that is the basis of her claim. Thus, I would find the first possible exception to immunity does not apply.

{¶71} As to the second possible exception to immunity, it could only apply if Lynch's "acts or omissions were with malicious purpose, in bad faith, or in a wanton or reckless manner[.]"

> "The standard for showing that a political subdivision employee acted with malicious purpose, in bad faith, or in willful, wanton, or reckless manner is 'rigorous' and will in most circumstances be difficult to establish." *Hoffman [v. Gallia Cty. Sheriff's Office]*, 2017-Ohio-9192, 103 N.E.3d 1, at

Case No. 2025-T-0018

¶ 39 [(4th Dist.)]; *see Argabrite v. Neer*, 149 Ohio St.3d 349, 2016-Ohio-8374, 75 N.E.3d 161, ¶ 8; *McDonald v. Lacy*, 2d Dist. Montgomery No. 27779, 2018-Ohio-2753, 2018 WL 3414377, ¶ 26. Consequently, summary judgment is appropriate if the employee's conduct does not, as a matter of law, rise to the level of maliciousness, bad faith, wantonness, or recklessness. *Id*.

*Townsend v. Kettering*, 2022-Ohio-2710, ¶ 31 (2d Dist.).

{¶72} Each of these terms differs slightly from each other. "Malice" is a willful and intentional desire to harm another, usually seriously, through unlawful or unjustified conduct. *Moffitt v. Litteral*, 2002-Ohio-4973, ¶ 96 (2d Dist.), citing *Alley v. Bettencourt*, 134 Ohio App.3d 303, 315 (4th Dist. 1999). The term "bad faith" refers to a sinister motive having no reasonable justification. *Id*. "Wanton misconduct is the failure to exercise any care toward those to whom a duty of care is owed in circumstances in which there is great probability that harm will result." *Anderson v. Massillon*, 2012-Ohio-5711, ¶ 33 quoting *Hawkins v. Ivy*, 50 Ohio St.2d 114, 117-118. And "[r]eckless conduct is characterized by the conscious disregard of or indifference to a known or obvious risk of harm to another that is unreasonable under the circumstances and is substantially greater than negligent conduct." *Id*. at ¶ 34, citing *Thompson v, McNeill*, 53 Ohio St.3d 102, 104-105 (1990).

{¶73} Musson stated that sometime before May 6, 2021, she reported suspected City fraud to a regional state auditor. (Musson depo. 38). Her allegations included unethical spending, potential employee theft, no oversight of Lynch's spending, and nepotism on contracts. (Musson depo. 38-42). On May 6, 2021, Musson advised the City law director of an impending state audit. (Musson depo. 43; Musson Aff. ¶ 6). The next day, Lynch placed Musson on paid administrative leave and told city council and the public that she was ill. (Musson depo. 43; Musson Aff. ¶ 7). Lynch instructed Musson that she was to obtain evaluations from On-Demand and PRADCO relating to her mental and physical health. (Musson depo.127-130). On June 13, 2021, Musson stated that Lynch placed her on unpaid leave. (Musson depo. 44; Musson Aff. ¶ 10).

{¶74} Musson further stated that Lynch obtained tape recordings of marital conversations between her and her ex-husband, which made their way onto Facebook.

Case No. 2025-T-0018

(Musson depo. 45-46; Musson depo. 232). She stated that Lynch also authored a "report" or "dossier" about her, which he distributed to city council. (Musson depo. 268). This report did not remain confidential and was passed around at a city council meeting. (Musson depo. 268-269). This report consists of 13 pages. (Musson depo. Ex. 15). It details Musson's employment with her past employers dating back to 2001 and continuing through her employment with the City. (Musson depo. Ex. 15). It appears to consist almost completely of hearsay. (Musson depo. Ex. 15). The report makes allegations that: (1) Musson left a former workplace "with the wreckage of destroyed employee morale in her wake"; (2) Musson's next employer was "the object of Anna's psychological warfare"; (3) Musson was described by a former employee as being "in deep need of psychiatric treatment"; (4) Musson suffered from a "catatonic Charles Manson-like [s]tate of insane rage"; (5) Musson asked for advice "as to how she might manage the murder of her ex-husband"; and (6) Lynch listened to an audio recording between Musson and her ex-husband where she threatened to "put a bullet in [his] fucking head". (Musson depo. Ex. 15).

{¶75} Lynch, on the other hand, stated that his objective for requesting that Musson be evaluated at PRADCO was to help him "get a better handle on the employee relations problems she had been having." (Lynch depo. 42). He was hoping to assist and "rehabilitate" Musson. (Lynch depo. 42). He stated that, although he never observed Musson act inappropriately, the employees Musson supervised complained to him that Musson was an abusive manager. (Lynch depo. 51). Lynch considered this evaluation to be a "fitness for duty" exam. (Lynch depo. 68). He was concerned that Musson was not mentally able to perform her duties. (Lynch depo. 68-69). He also referred Musson to On-Demand for an evaluation. (Lynch depo. 51, 80-82). At this point, Lynch considered Musson to be on medical leave pending her evaluation. (Lynch depo. 69). He stated this was a "judicious" action to take as a precaution to prevent possible emotional problems and/or a physical altercation in the workplace. (Lynch depo. 80). Lynch acknowledged that he requested the evaluations and placed Musson on administrative leave after Musson informed the City about an investigation by the Ohio Auditor's Office regarding improper city expenditures. (Lynch depo. 77-80).

{¶76} As to the report Lynch prepared that he gave to city council, Lynch admitted that a "high percentage" of it was hearsay. (Lynch depo. 107). He stated his purpose in compiling this report was to keep city counsel "informed." (Lynch depo. 107). He admitted to comparing Musson to Charles Manson in the report. (Lynch II depo. 36). Lynch stated that Musson's ex-husband, Chad, contacted him to tell him that Musson had serious anger problems and he had audio tapes to prove it. (Lynch depo. 111-112). Lynch asked Chad to provide him with the tapes. (Lynch depo. 113). Lynch stated that the tapes were of conversations between Musson and her ex-husband dating back ten years. (Lynch depo. 113). These tapes involved intimate details about Musson's marriage. (Lynch depo. 122-123). Lynch provided a copy of these tapes to the City. (Lynch depo. 123). During all of this time, Lynch was employed as the city manager and acting within the scope of his employment. (Lynch depo. 121).

{¶77} Explaining our review in this type of case, this Court has stated:

> However, "[i]n a summary judgment review, the court may not weigh the proof or choose among reasonable inferences[.]" *Coterel v. Reed*, 2016-Ohio-7411, 72 N.E.3d 1159, ¶ 15 (2d Dist.). Further, our review does not pertain to whether there is factual support for the underlying claim, as the "appeal is limited in scope to a determination whether there are genuine issues of fact material to the defense for statutory immunity." *Id*. "'Consequently, in order to sustain a motion for summary judgment predicated upon immunity bestowed by R.C. 2744.03(A)(6)(b), a court must conclude that the record is devoid of evidence tending to show that the political subdivision employee acted wantonly or recklessly.'" *Coterel* at ¶ 15, quoting *Irving v. Austin*, 138 Ohio App.3d 552, 556, 741 N.E.2d 931 (6th Dist.2000).

*Kubala v. Smith*, 2023-Ohio-991, ¶ 30 (11th Dist.).

{¶78} I would find the record here is devoid of such evidence. I would find that at all times, Lynch was acting within the scope of his employment as the city manager. He was faced with an employment situation involving Musson and other employees whom

Lynch supervised. A determination as to whether a governmental employee acted with malicious purpose, in bad faith, or in a wanton or reckless manner focuses explicitly on the employee's state of mind at the time. *Coterel v. Reed*, 2016-Ohio-7411, ¶ 20 (2d Dist.), citing *Chesher v. Neyer*, 477 F.3d 784, 797 (6th Cir.2007). Lynch was concerned with the possibility of a mental health situation. Musson did not put forth any evidence to dispute this. Thus, I would find the second R.C. 2744.03(A)(6) exception to immunity does not apply here.

**{¶79}** In sum, because I would conclude none of the statutory exceptions to immunity apply, I would reverse the trial court's decision and enter summary judgment in favor of Lynch.

Case No. 2025-T-0018

# JUDGMENT ENTRY

For the reasons stated in the opinion of this court, Appellant's assignment of error is without merit.  It is the judgment and order of this court that the judgment of the Trumbull County Court of Common Pleas overruling Lynch's motion for summary judgment predicated upon political subdivision employee immunity is affirmed and this matter is remanded for trial.

Costs to be taxed against Appellant.

JUDGE KATELYN DICKEY
SEVENTH DISTRICT COURT OF APPEALS
SITTING BY ASSIGNMENT

JUDGE CAROL ANN ROBB
SEVENTH DISTRICT COURT OF APPEALS
SITTING BY ASSIGNMENT,
concurs

JUDGE MARK A. HANNI
SEVENTH DISTRICT COURT OF APPEALS
SITTING BY ASSIGNMENT,
dissents with a Dissenting Opinion

**THIS DOCUMENT CONSTITUTES A FINAL JUDGMENT ENTRY**

A certified copy of this opinion and judgment entry shall constitute the mandate pursuant to Rule 27 of the Ohio Rules of Appellate Procedure.

Case No. 2025-T-0018